Alright, the last case for this court today is apparently a consolidated matter. Case number 415-0847 and 416-0667. Carroll v. Community Health Care Clinic, Inc. for the appellant Joe Bartholomew for the appellee Adam Vaught and Jonathan Bobble. Am I supposed to say that wrong? Bobble, Darnit. It's my first one I miss. No, it's the second one I miss today. Ten minutes apiece, right? Okay, very well. Mr. Bartholomew, you may proceed. May it please the court, counsel, good afternoon. My name is Joe Bartholomew. My co-counsel is Leah Captain. We're here today representing David Carroll, the plaintiff in the underlying action. We're here to ask you to reverse the order of the 11th Circuit Judicial Court in McLean County that granted the defendant's motion to dismiss in this matter. As you gleaned from the pleadings and the briefs, this is a case of first impression in our state. In fact, we were talking ahead of time that they're not even aware of maybe only one other case that has alleged medical negligence in the state of Illinois against the clinic or healthcare provider in the clinic. Certainly I know of public court cases, so the issue that this court must decide is whether or not a healthcare provider at a free medical clinic who is being compensated for her time at that clinic is afforded the protections under the Good Samaritan Act in the state of Illinois, which, as you know, has a provision in the beginning that says that this act is designed to provide protections and to encourage volunteerism in our state. Since it's a matter of statutory construction, it is a de novo review by this court. If the court would allow me just a second to digress and provide just a little bit of the facts, because we did have this case come to the court on the pleadings. My client, David Carroll, was 45 years old, indigent, and presented himself to the clinic on two occasions with classic symptoms of cardiovascular disease. And he had classic risk factors for cardiovascular disease. He had high cholesterol and he was a prior smoker. The nurse practitioner here, defendant McGinnis, diagnosed him with GERD, gave him antacids, sent him on his way. He came back in a few weeks later saying it hasn't helped at all. I now have problems with exertion. He had difficulty breathing. He was tired even after eating. At that point, she diagnosed him with the possibility of cardiovascular problems, although she never ordered a test that would have ruled it in or ruled it out. A few weeks later, he unfortunately sustained a massive myocardial infarction, destroying about 70% of his heart function. His ejection fracture, which is a test used to determine how well the heart is working, indicated it was down to 25% or less. He was on a heart transplant list for a period of time. We filed this action in Bloomington, alleging negligence on the part of the nurse practitioner for her failure to diagnose and treat in a timely manner his cardiovascular disease, which was a correctable condition. And we also alleged a claim against the physician who was the supervising physician at the clinic, as well as a claim against the clinic. The field of defendants moved to dismiss the action, alleging that they were protected in part by the Good Samaritan Act in the state of Illinois. That was enacted in 1997. Additionally, the defendant physician alleged that he was just a collaborating physician and under the Medical Practice Act, he was immune from suit for their negligence. There was no allegations of willful and wanton misconduct here. The procedural background of the case is they filed affidavits in support of their positions. They were obviously kind of cute in the affidavits. They did not disclose in their affidavits that the nurse practitioner was an employee of the hospital and was being paid by the hospital to see patients in the clinic. And as you know from the pleadings, the clinic was designed essentially to funnel patients who otherwise would go to emergency rooms and burden the emergency rooms with their primary care. That's the stated purpose behind this actual creation of these free medical clinics. It was not disclosed in the affidavit that, oh, by the way, I am being paid. I am not a volunteer. Nurse McGinnis was not a volunteer. She was being paid as a hospital employee to see patients at this clinic. We then sent interrogatories to the defendants asking them if there were any contracts that they were working under with respect to the clinic and were they being compensated. It was only then that we learned through that discovery that Nurse McGinnis was in fact an employee of the hospital and being paid while she was seeing patients at the clinic. We argued the motion to dismiss. The court decided against us. Arguing specifically, the court found that because of a provision in the Good Samaritan Act, contrary to the general purpose of the Act and the stated legislative purpose of the Act, which was to promote volunteerism and to encourage volunteerism and to protect those who truly volunteer their time and services to help the indigent in our communities. The court ruled against us on that, saying that because of a sentence or actually one word in the Good Samaritan statute under Section 30 that uses the term back source, that because they were not paid, the nurse in particular, Nurse Practitioner McGinnis was not paid by the clinic, that therefore she was entitled to the immunity in the Good Samaritan Act even though she was not a volunteer and was being paid for her services. The only justification, your honor, the only way you can really read a purpose into the statute is exactly your point, that what the legislature, although it's not in the legislative history, but what the legislature maybe was intending to do was to do, we want to encourage people to volunteer for free, but we also want to encourage hospitals to volunteer for free. We want to encourage hospitals or medical corporations to donate their personnel to the clinic. I did that as a lawyer. My firm, I worked at General Block in Chicago for a period of time in the summer. They would donate lawyers to do pro bono work. The lawyers were paid. They weren't losing any money by doing the pro bono work, but it was a donation by the law firm to encourage work for the indigent. And you're exactly correct, but for what we discovered during the pendency of the appeal. We didn't really discover it. They disclosed to us the fact that there was this lease agreement that specifically negates what you're asking about, your honor, that this wasn't a benevolent hospital donating the services of its personnel to work at this clinic. This was a hospital that had a contract with the clinic that specifically required the clinic every month to reimburse the hospital for the compensation paid to the nurse. So this wasn't the hospital donating anything. They had an agreement. An agreement that's not only just for the, I mean, you can look at the language of the agreement. It's interesting because it's part of our brief. Not only for the wages that were paid, but also for the benefits that the nurse received from the hospital. So this clinic was reimbursing the hospital by contract, required to by contract, the full value of this nurse that's being provided by the hospital to the clinic. So you're absolutely correct. If really the legislature was intending, and that's one way you could read that provision by that source, because otherwise that source means nothing. It really makes no sense whatsoever. There's only one other explanation for that, and that's a mistake. That it really should have read any source. Because when you look at the legislative history, it makes no sense. And even if you look at that provision in the statute, section 30, why would they say that source? The only source they were talking about was the clinic. And why would they care if what the defendant in the lower court ruled here, that the clinic was paying this nurse? If the legislature truly intended through this Good Samaritan Act and this provision to immunize and protect individuals who work at this clinic, regardless of who they're paid by, and that they are paid, all they had to do is say, if you go to a free medical clinic, you can't sue. We do that in other places. What if I get a MacArthur grant for my good works, but my good works are providing free medical care? And then I use that MacArthur grant to finance myself for the next three years, providing that medical care at this clinic. I'm getting paid. Well, you are getting paid. I'm getting compensated both by the prestige and by the dollars that flow into my pocket while I'm doing this good work in the community. Well, again, if that were the case, it's not the case here, and I don't know the specifics. Well, I know, but judges like to ask hypotheticals. No, no, that's a good question because, again, it raises a point that you raised at the beginning, which I think is the only way you can justify what the legislature did here unless you find that there was a mistake. That they were truly intending to protect the people who volunteer their time and services. It's a Good Samaritan Act. There's no dispute with the Good Samaritan Act purposes. And they also wanted to protect those individuals who were being lent and given free to these clinics by corporations, medical corporations, or hospitals. And that would be fine, and that would be okay, and it would be justifiable, but for the lease agreement here. The lease agreement negates that completely. This hospital isn't being benevolent. They have a contractual relation with this clinic that they set up to funnel patients away from St. Joe's Emergency Room. And what do they do? They get paid for it. And, in fact, if you look at the statute, if you read down the statute, it's really even more interesting because this is why I think it's absolutely incorrect, any other interpretation of that statute, especially the interpretation that the defendants want to give. If you go to Section E, the provision in there that talks about if there are voluntary contributions made by the patient. That provision specifically says, if you look at it, that any voluntary contributions collected for providing care at the free medical clinic shall be used only to pay overhead expenses of the clinic. No portion or any monies collected shall be used to provide fee or compensation to any person licensed under the Medical Practice Act. That's clear as day. We don't know, as this record is before this court, as to whether or not any monies that they collected from patients who volunteered donations to the clinic were used to pay the lease agreement that they had with the hospital. We don't know that. And how does that provision ever be read consistent with the provision in Section 30 up above that says, from that source? It doesn't make any sense. It can't be consistent. If you look at the 2005 tort reform provision that was held unconstitutional because of the caps by the Supreme Court, there was a change to this provision. It included a provision that added more clinics into the definition. But that provision actually said, specifically, that any healthcare professional receiving an exemption under this section may not receive any fee or other compensation in connection with any services provided to the clinic. Again, plain as day. Now, that's not part of the present-day statute because it was held unconstitutional because of the caps. But that clearly indicates the legislature's intent. There was nothing discussed about that provision when they enacted the 2005 tort reform package. Nothing at all. And so, obviously, the legislature thought that, similar to what we all thought to be the case under the Good Samaritan Act, as stated in the general purpose of the statute, to promote volunteerism. So, as I understand your argument, you're asking this court to make the determination that the language, from that source, actually means from any source. Is that what you're arguing? Well, no. We could accept the argument we were just making, which I think is a valid one, that maybe the legislature, even though it's not in the history, but certainly would be the purpose behind the statute, would be to protect people who volunteer, volunteer their services at the clinic for free. So, I'm a doctor. I'm going to go work at the clinic on Saturdays. I'm a nurse practitioner. I'm going to go work on my days off. Or, we're going to protect those individuals who are being donated by hospitals or medical corporations. Then you could read that source to mean that they're not being paid directly by the clinic. But in this particular instance, unfortunately, they are being compensated. If you look at the lease agreement, the actual title of the section is compensation. But they're not compensated by the clinic. They are being compensated by the clinic. In this particular instance, they are, because there is an agreement, in effect, where the hospital pays, I mean, the clinic pays the salary of the nurse. By repaying it to the hospital. I don't know if it's repaying it to the hospital. The section says compensation. And it says in that section that you're going to, every month, give us the amount of money for the nurse practitioner or anybody else that we give you there. Plain and simple. So, I mean, did the legislature really intend this to be the case? Do we really believe that the legislature, in the Good Samaritan Act, intended for employees... Well, it sure looks like it, because they chose the language from that source. But do you think the legislature truly believed that the hospital would have, then, an agreement that we reimburse the hospital from the clinic, so money, donations to the clinic? Well, when it says from that source, it seems like you may infer that the legislature contemplated that they may, these people may be getting compensated from a different source. That's what it appears. It could appear to that, but it's obviously in contravention of the purpose of the statute, which is to promote volunteerism, number one. Secondly, it's in contravention of the later provision in the same statute that says that if they get money from contributions, voluntary contributions from their patients, that none of that money can be used to pay for the people who work there. So that's obviously in contravention of the statute. And if what you're saying is correct, who cares? Why would, what purpose could there possibly be for the legislature to exempt the clinic from getting money from the clinic? If they're going to allow the clinic to have employees that are being paid and are truly not volunteers, and if the only relevant inquiry is whether or not the patient doesn't pay for the services at the free medical clinic, why do we carve out, why do we care if they're being paid for by the clinic or not? What practical purpose in our law would that particular interpretation of the statute serve? I've racked my brain. I've racked it since day one in this case, and the only logical conclusion I can tell you is that either that that should have been any, and it was clearly a mistake, or, as the justice pointed out, they wanted to encourage the donation of personnel to the clinic. But I don't believe that that occurs here when they're being reimbursed for that, because it truly is not the donation. This isn't a law firm. If you're like a law firm, my law firm, I'll send Leah down to go work at the Land of Lincoln, but by the way, I'm going to have a contract with the Land of Lincoln to pay me for Leah doing the work at the Land of Lincoln. Is that truly what we think happened here? I mean, that the legislature intended? And again, I'd like somebody, anybody to tell me why, if what you're saying is correct, why do we carve out the clinic? Why do we care one way or the other if the clinic pays these people or not? These people are getting free medical care, and if that's the only inquiry, then why can't we just say it? Why put it in the Good Samaritan Act? There's no reason to do it. Just make a provision. We have it for community hospitals. Community hospitals, you can't be sued for their failure to diagnose, and their personnel can't be sued for their failure to diagnose, so there's no reason why we can't include that in some provision if that was truly the intent. But why do you put it in the Good Samaritan Act when you say in the Good Samaritan Act the purpose is to encourage volunteerism? And I submit again, there's only one interpretation that you can rationally make here, although again, not supported by the language of the statute, is that we want to encourage hospitals to donate their services of people to this clinic, but that was not what happened here once we discovered the lease agreement. Thank you. Thank you. You'll have rebuttal. Please proceed. Thank you, Your Honor. May it please the courts, counsel, I'm Adam Vaught. I'm representing Dr. Paul Pedersen and Nurse Sue McGinnis. Mr. Bobo will speak on behalf of the clinic in the final ten minutes. We ask this court to affirm the trial court on two bases. I want to address first the dismissal of Dr. Pedersen and why that should be affirmed. He was dismissed actually under the Medical Practice Act because under the Medical Practice Act, specifically Section 54.5E, states that a physician should not be liable for the acts or omissions of an advanced practice nurse only on the basis of having a signed collaborative agreement. The affidavits that were referenced stated that Dr. Pedersen did have a collaborative agreement for Nurse McGinnis if she needed collaboration as an advanced practice nurse to reach out to a doctor. In this case, the plaintiff came twice. She gave him care. Dr. Pedersen was never called, probably didn't even know about this gentleman until this lawsuit. Under the Medical Practice Act, since he cannot be held liable simply because of a collaborative agreement, it was proper to dismiss him. And so we would ask to affirm Dr. Pedersen's dismissal on that ground. Moving to the Good Samaritan Act, which seems to be the focus of the case, Nurse McGinnis was dismissed under Section 30. We also think that Dr. Pedersen could be dismissed as well and that he could affirm on that ground. Section 30 states that an advanced practice nurse who provides medical treatment as part of the services of a free medical clinic, providing care to medically indigent patients, and this is the important part, who receives no fear compensation from that source, is immune from civil damages. I want to first talk about the purpose behind the Act. Council referred to it as promote volunteerism, but the purpose statement in the Good Samaritan Act actually is a little broader. It says that the Act provides both protections for the generous and compassionate acts of its citizens who volunteer their time and talents. Certainly volunteerism is in there, but it's focused on the compassionate and generous acts. In the Homestar case, plaintiff's sites, which we referred to in our brief, the Illinois Supreme Court reviewed Section 25 of the Good Samaritan Act. The history of it is that it started actually within the Medical Practice Act, where the legislature removed immunity from any doctor who assisted somebody in a car accident or a nuclear attack. Eventually that was modified to remove specifically car accidents and nuclear attacks to make it more broadly, and then in 1996 the legislature enacted the Good Samaritan Act. The purpose behind that is not to promote volunteerism. It was to remove a fear from somebody who sees an emergency incident from rushing over to render aid. It's sort of the, is there a doctor in the house scenario. You don't want an emergency where somebody's falling down and a doctor's there and it's like, I don't have my equipment, I don't have my staff, I don't know if this is sterile, I'm just going to avoid this because I don't want to get sued. You want to remove the liability for that situation so the doctor's free to render the aid in that emergency situation. The legislature later added a section that dealt with free medical clinics. Now free medical clinics provide treatment to people who are indigent and can't afford medical care. The Compassionate Generous Act is that in order to make sure that there is some medical care available, that they can go to these clinics and not pay a fee for the care they receive, and in this case the plaintiff was not charged a fee. If you go into the medical clinic too by the statute, you see signs on the wall that says you're at a free medical clinic and that the people who are providing service are immune from civil liability. To refer to the Homestar Bank case, in that case a person went into the emergency room, there was a code blue, essentially his throat had clogged up, as part of rendering treatment he suffered brain damage and was rendered severely disabled. Well the hospital didn't send a bill and so they said that under section 25 they were immune. The Supreme Court analyzed some appealed opinions from the state as well as some federal opinions and they said really that the without fee phrase there was not so much a bill, but whether or not the doctors paid, and in that situation a doctor was on call at a hospital, there was a code blue, he had no discretion not to go, he went, there was an expectation that he was going to be paid. If you really look at that case, it's really more what is the expectation of the person who is receiving the aid so much as the person who is rendering it. If the person goes into a hospital expecting to be treated and they're a paying patient and there's a mess up and then the hospital and doctor just say, hey we're not going to charge you for that, no worries. That sort of is an escape out of liability. Here though when you're going to a free medical clinic and on the wall it says this is a free medical clinic, people who are rendering service aren't liable for civil immunity. You're under the expectation that in exchange for that service that you're getting for free that you're not going to have civil liability. Now to the question of whether or not the clinic is the source of Nurse McGinnis' fear compensation, there was a contract that OSF Hospital and the clinic had. Keep in mind Nurse McGinnis is being sued, it's not the hospital. She wasn't a party to that contract. I don't know, I can't state, it's not on the record whether she raised her hand and quote unquote volunteered to go over to the clinic, but the clinic and the hospital do have an arrangement. But she isn't dependent upon the clinic paying the hospital in order to receive her payment. The contract actually refers to after, you know, that reimburses her for the compensation she's been paid. It's in the past tense. It's implied in that contract that she's already been paid. So, you know, just because the hospital receives compensation in its general accounts, which then uses, it's used to process payroll for all of its employees, doesn't mean that she specifically has an agreement with the clinic to get paid by the clinic. She's not an employee. To get to the purpose of why there would be that carve out for just that source as opposed to any source, it's because if you have a free medical clinic, this isn't an emergency situation. This is 9 to 5 Monday through Friday. And if the clinic is going to have its doors open, it needs to make sure that there's somebody there for the people during the time it says it's going to be open. I think counsel said that people should go on their free time or their weekend. But if somebody's available, if somebody's not available, there needs to be some sort of mechanism so that they can provide for the, you know, to provide for staff on duty in order to give the care for the people who come in. And if the hospital were to completely volunteer, that is great. But if there's an arrangement, whether the hospital is going to be compensated just for its costs, I mean, that also works as well because, you know, the hospital, I think you had made the analogy that you could send your associate or partner to Land O'Lincoln and, you know, Land O'Lincoln would compensate you and now you're not giving anything up. Well, you're giving up the profits you would have made during that time. I mean, you may not be out of pocket anything for your costs, but you're certainly giving up the time where you could have been focused on your business and making money. You know, here the nurse is not at the hospital working for the betterment of the hospital. She's at the clinic providing the free medical care. And so the hospital is volunteering something. It's volunteering the profits that they could have made. So, you know, I think that the important part of the Act is not the volunteer part because volunteer doesn't necessarily have to be without any fee. I mean, the legislature specifically said from that source. It could have said from any source. And in other places throughout the Good Samaritan Act, it does refer to places without any fee or compensation. You know, a volunteer, just because they're volunteering their time, doesn't mean they're not paid. The military is a volunteer, you know, branch of service. You know, if they get paid, nobody would say that they're not volunteers. So the mere fact that she's paid from any source doesn't take this out of the statute. It would have to be from that source. And in this arrangement, she was not paid. I started your comments talking about compassion. Yes, sir. What compassion does it show for this hospital to be paid back, reimbursed, whatever the phrase is, for this person? I understand what you said about it'd be better to have her on staff at the hospital. Maybe they had to hire an additional nurse practitioner. I understand that part. But in terms of PR, it doesn't ring compassion. Well, I think that providing the, availing its resources to the clinic in order to staff it, if there is some time when they don't have the free volunteers. So I'm not giving enough credit to that, that they're providing an experienced professional, and they're just getting reimbursed for the upfront costs of having another person on staff or whatever. Correct. That's still a good thing. Yes, I mean, they could just say, no, we have no interest in doing that. But they haven't. They've said that we'll provide medical staff that's available, and we just need to be re-compensated for our costs. So you're already getting a person that's been vetted by the hospital. Correct. In the sense of, this is a good person, that's why we're giving it to you. Or you hope they've done that. Correct. I mean, arguably, you would think that somebody who's currently working at the hospital has their current, if I can finish the question, answer. You know, that they're currently trained, they're up on whatever the CLE version is for nurses or doctors. Whereas, if it's somebody who's just volunteering, you have no idea if they've been working lately or not. Okay, thank you. Thank you, Your Honor. Thank you. May it please the Court and Counsel, my name is John Bova. I represent the Community Health Care Clinic. Also with me today are Angie McLaughlin, Executive Director of the clinic, also Todd Anderson, and Mr. John Kim. I think, as Counsel has made clear, my colleagues, that this case presents an issue of statutory construction. Specifically, we're looking at Section 30 of Illinois' Good Samaritan Act. Now, the primary issue, as it relates to the clinic, is a little bit different than the issue that's been addressed so far by Counsel. And that is, whether the legislature intended to grant immunity directly to the free medical clinic, or whether it intended to limit that immunity, apply it only to individuals, and leave the clinic out. I think that the trial court was correct in ruling that the statute intends to provide that direct immunity to the clinic. I want to speak briefly about the clinic, and who they are, and what they do, and then also talk about why Appellant's reading of the statute would produce absurd results. So the clinic itself, for almost 25 years, in the Bloomington Normal community, the Community Health Care Clinic has been providing care to patients there, and patients residing throughout McLean County. Their mission has, and will continue to be, to provide quality health care to the medically underserved population of McLean County, through the operation of a free medical clinic. Their vision is to ensure that everyone in McLean County has access to health care. I'll state very simply that these are turbulent times in our country with respect to access to health care. And this clinic, and others like it throughout the state, provide a crucial safety net for who are primarily low-income, working families who need access to health care. I'd like to take issue with Appellant's characterization of the clinic as designed to funnel patients to the hospital. That's simply not the case. Does the clinic alleviate strain in emergency departments from patients coming there with sore throats or with other minor ailments? Yes, it does. But the real benefit, the primary benefit, is to the community in those emergency departments can tend to real emergencies. As I noted, well, I guess I should start by saying that the statute here is ambiguous. I don't know that there's any contest about that. My colleague here didn't argue it, but I think, I'll say that I've read it dozens of times and still wrestling with the language. Because it is ambiguous, we can look beyond the language of the statute. What was the purpose? And I think Appellant's reading, which states that the immunity should only be provided for the individual health care providers, but not the three clinics themselves, gives us absurd results. Why? Well, because the immunity within the statute depends on, one, the existence of the clinic, and two, that immunity depends on the actions of the clinic. Now, it depends on the existence of the clinic. The statute is clear on this point that in order for that immunity to apply, so that they can receive that immunity, a health care provider has to provide services through the pre-medical clinic. If they're giving free services at a hospital, they don't receive that immunity, except under limited circumstances, which I'll get to in a moment. Same with at an outpatient clinic. Free services there, no immunity. Not even if they are at a non-profit clinic that would charge patients on a sliding scale based on their income, or they provided immunity under the statute. So we only have the immunity through the pre-medical clinic, which is defined within the statute. So the immunity depends on the existence of the statute. It also depends on the actions of the pre-medical clinic. First, we know that a pre-medical clinic has to post a sign explaining the immunity within their premises. Here, the community health care clinic has done that. There's no question about that. But it's something the clinic has to do to secure that immunity under the statute. Second, and this is that exception I mentioned just a moment ago, if a health care provider is working within the free clinic, refers the patient from the clinic to a specialist, to a hospital, to another clinic, to a surgery center, and that provider treats or gives advice to the patient at no cost, then that provider is immune. That provider receives immunity under the statute because they were referred from the free medical clinic. Now, so clearly we have immunity for providers within the clinic. We have immunity for providers who have taken referrals from the clinic, and that's because they've been brought under the clinic's umbrella. It frankly strains logic to believe that the legislature intended to provide for doctors, nurses, working in the clinic, specialists who receive referrals from the clinic, but not give that same immunity to the clinic itself. Appellants asking the court to believe that the legislature intended for the clinic to be the one to open the umbrella to provide the immunity, then bring these individual health care providers under that umbrella, but at the same time, the legislature intended to push the clinic out from underneath the umbrella and say it's an absurd result and I don't think the court should adopt that reading. Now, it also produces an absurd result because an immunity that applies only to health care providers within the clinic provides an incomplete incentive for those providers to volunteer. I think an illustration is the most clear way to explain this. If Dr. Jones volunteers at the clinic, they see a patient, the patient isn't happy with their care, they file a complaint against the clinic, that likelihood, or the complaint in all likelihood against the clinic is going to read the community health care clinic by and through their apparent agent, Dr. Jones, was negligent in one way or another to give a deposition. She's going to have to be worried throughout the pendency of these medical malpractice cases which take something like four to six years to come to resolution that her care that she's provided has put the clinic on the line, has hurt the clinic's reputation, she's going to have to go through trial, and she may face regulatory issues with the Illinois Department of Financial and Professional Regulation. All of these things, all of these hassles that that physician who volunteered has to face discourage volunteering. Because if the clinic is not immune, then the health care provider still has to go through all of those inconveniences, all of those hassles of litigation. And once she does, everyone else who knows that she's had to go through those things isn't going to want to volunteer at the clinic either. A chilling effect on the clinic threatens the clinic. The clinic may have to close its doors. Now the Act states, without limitation, without limitation, the provisions of this Act shall be liberally construed to encourage persons to volunteer their time and their talents. I would submit that an immunity that applies only to the individual providers and not to the clinic itself doesn't serve that purpose. It doesn't encourage persons to volunteer their time and talents. And so I think for that reason we have to have direct immunity for the clinic. I think the trial court was correct in that ruling. In fact, Appellant's reading is directly contrary to that purpose of the statute. I just note briefly that even if the clinic is not directly immune, the clinic is immune for reasons stated by my co-defense counsel within their briefs. We would adopt those arguments as it has been alleged that Dr. Peterson and Sue McGinnis are agents or apparent agents of the clinic. And we would ask the judgment of the trial court granting the clinic's motion to dismiss the affirmative. Thank you. Thank you, counsel. Is there any rebuttal? Not really. Let me start off by saying that he is absolutely correct as it relates to the clinic. It makes no sense for there to be immunity for the employee and not immunity for the clinic, but for the fact that it's not in   a young lawyer years ago, goofy probably, filed a lawsuit over in St. Louis alleging that a patient who had been in the clinic for a long time had been a police officer who was the sheriff of Christian County was, civil rights were violated and he was defamed when he was, they alleged he was in a bar wielding his badge and gun in Missouri. And I had sued the newspaper in Illinois that published a story that we believe was false. The judge, they moved to dismiss, the federal judge in the Eastern District of Missouri dismissed the newspaper, not because of lack of jurisdiction, not because of lack of personal jurisdiction, but for a convenient reason for him or his law clerk, for improper venue. I refiled the action in Christian County and they moved to dismiss saying that well improper venue, dismissal by the federal court for improper venue is not saved by the saving statute. It's clearly not indicated in the Supreme Court. There's nobody, not one justice or anyone who could argue that there was a rational basis for excluding improper venue when lack of jurisdiction was one of the reasons that would allow you to refile within the saving statute. I could file a lawsuit in Alaska and been dismissed for jurisdiction and would have been saved, but because it was dismissed by this judge and federal court for venue, I lost. Although the Supreme Court lost, the argument was you're absolutely correct. There's no sense, no logic, but it wasn't in the statute. Unfortunately, that's happened here. I mean, it's just not in the statute. Whether we like it or not, I agree entirely with them. It should be. There's no rational basis for saying that an employee should be immune, but the clinic should not. It's plain and simple. I'm not going to sit here and try to kid you. So as it relates to that, unfortunately, though, the statute doesn't say it, and it clearly says otherwise. And very quickly, as it goes over and over again, that lease agreement specifically delegates the responsibility of supervising these personnel from the hospital to the clinic and the medical director at the clinic. So pursuant to this lease agreement, it says specifically that they have to supervise. So this is not something that should have been addressed and dismissed on a motion pursuant to 619 based on the affidavit of the doctor under the Medical Practice Act, which is correct. The reading of the Medical Practice Act is exactly correct. I can't sue the doctor just for his collaboration with the nurse practitioner, but I certainly can sue the doctor for his own negligence or his being negligent in supervising the nurse. And he did have those obligations under the lease agreement as provided by the lease agreement between the hospital and the clinic. Again, we have not heard one again. Not one person has suggested why. If what they say is true, all they had to do is include the clinic. Why did they have to say from that source? Why do we care if the clinic paid these people or not? What rational basis is there? What's their argument? Why would, if someone else is paying them, we're going to give them immunity, but if the clinic pays them or not? What if the clinic was in a location   paying so much money for so many hours in Illinois and was required to pay minimum wage? There's no immunity. Even though they're donating a substantial amount, a doctor who is entitled to $200 an hour, is donating all that time to get $10 an hour, it certainly falls within the purview  law. But they wouldn't be protected. Why? What's the purpose behind excluding the clinic? There is no purpose. And again, the only possible rationale would be the suggestion that you had, that we want to encourage these volunteers, and we want to encourage hospitals and doctors to be donated by their corporations. Just like law firms donate associates or partners. That would be the only justification. But here, it's different. And you can look at the lease agreement and it says specifically compensation for leased employees. That's the title of the section in the lease agreement. And it's not just wages. The leasee, that's the clinic, shall pay using the money that's donated or granted to the clinic or contributed to the clinic by these patients the productive salary and wages and the nonproductive wages paid by the leasor and the amount equal to the benefits that the hospital is paying for these employees. That would make sense. Have fun with it. It's an interesting case. Excellent. Thank you for all the way around. The case is submitted. The court stands in recess until further call.